IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Angelo Ham, ) | |
| ) | Civil Action No. 6:14-783-JMC-KFM |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| Larry Thompson, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

    This matter is before the court on the defendant's motion for summary judgment (doc. 16). The plaintiff, a state prisoner who is proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983.

    Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(d) DSC, this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the district court.

    On May 21, 2014, the defendant filed a motion for summary judgment (doc. 16). By order filed that same date, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The plaintiff filed his response in opposition to the motion for summary judgment on June 27, 2014 (doc. 19)

## **FACTS PRESENTED**

    The plaintiff is currently incarcerated in the Special Management Unit ("SMU") at Lee Correctional Institution ("LCI"), a South Carolina Department of Corrections ("SCDC") facility, where he is serving a life sentence for murder. The plaintiff alleges that on January 29, 2013, he complained to defendant Officer Larry Thompson about not receiving the correct breakfast tray and asked him "to get the [lieutenant]" (doc. 1, comp. 3-4; doc. 19-1,

pl. aff). Unsatisfied with Officer Thompson's answer that he was "not going to get anybody, take it or leave it," the plaintiff stuck his arm through the cell food flap and would not remove it as directed by correctional officers (doc. 19-1, pl. aff.; doc. 16-5, Buterbaugh aff.). As open flaps are a security risk to officers and staff, Officer Thompson deployed chemical munitions to gain compliance (doc. 19-1, pl. aff.; doc. 16-3, step one grievance; doc. 16-5, Buterbaugh aff.).

In his affidavit, Lt. Buterbaugh indicates the plaintiff was ordered to remove his arm on several occasions. When he refused to move his arm, Officer Thompson administered chemical munitions toward the plaintiff's face. The plaintiff still refused to move his arm from the food flap, and additional chemical munitions were sprayed (doc. 16-5, Buterbaugh aff.). The plaintiff took evasive action by covering his nose and mouth with the shell of a deodorant bottle when chemical munitions were used, which rendered them less effective. During the time the chemical munitions were being deployed, Officer Thompson's gas canister malfunctioned. He switched canisters with Lt. Buterbaugh and gave the plaintiff several more orders to remove his arm. The plaintiff refused, and Officer Thompson administered additional chemical munitions towards the plaintiff's face (*id.*).

The plaintiff was eventually subdued by Deputy Warden Davis, Lt. Buterbaugh, and Officer Thompson, and the food flap was secured. The plaintiff was charged (doc. 16-5, Buterbaugh aff.). The plaintiff was seen by medical that day, and it was noted that he had no signs of distress, his eyes were clear, and his breathing was even and nonlabored (*id.*; doc. 16-7, med.). Two days later, on January 31, 2013, the plaintiff complained that his ear was bothering him due to being gassed, and he was instructed to flush his ear out with water (doc. 16-7, med. records). The plaintiff was seen in medical the next day, on February 1, 2013, complaining that his ear was irritated. The plaintiff stated that he had been rinsing his ear with cool water, and it had gotten better. No redness or irritation was noted in either ear (*id.*).

In his complaint, the plaintiff claims that, as a result of the defendant's actions, he suffered from "terrible burning sensations . . . in the ear" for approximately five days. He

requests a declaration that his constitutional rights were violated, compensatory damages of $100 a day, nominal damages, punitive damages, and costs.

According to the affidavit of Ann Hallman, the Branch Chief of the Inmate Grievance Branch of the SCDC, the plaintiff submitted step one and step two grievances regarding the incident (doc. 16-2, Hallman aff.). Specifically, the plaintiff signed his step one grievance on February 13, 2013, and it was received by the institutional grievance counselor ("IGC") on February 15, 2013. The IGC responded to the grievance on that same date, stating that a copy of the grievance had been forwarded to the Inmate Grievance Branch for possible review by the Division of Investigations ("DOI"). The response also stated that the time frames in GA-01.12 Inmate Grievance System for responses to grievances are not applied to grievances sent to the DOI, and the time frame for response begins once the grievance returns from DOI (doc. 16-3, step one grievance). The Warden responded on August 29, 2013, stating that the grievance was returned from DOI to be processed through the grievance system. As Officer Thompson was no longer with SCDC, Lt. Buterbaugh had been interviewed and documents had been reviewed. The Warden found that the plaintiff had refused to comply with a directive given by Officer Thompson, and chemical munitions were necessary to protect the institution. Accordingly, the grievance was denied (*id.*). The plaintiff signed a step two grievance on August 30, 2013, and it was received by the IGC on September 4, 2013 (doc. 16-4, step two grievance). Ms. Hallman stated in her affidavit, which was signed on May 21, 2014, that the SCDC had not yet issued a response to the plaintiff's step two grievance (doc. 16-2, Hallman aff.).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### *Failure to Exhaust*

The defendant first argues that the case should be dismissed because the plaintiff has failed to exhaust his administrative remedies. Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *See Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court"). "[T]he PLRA's exhaustion requirement is mandatory," *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005), and "applies to all inmate suits about prison life, whether they involve

general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Although the PLRA exhaustion is not jurisdictional, failure to exhaust is an affirmative defense that can be pleaded by the defendant. *Jones*, 549 U.S. at 216; *Anderson*, 407 F.3d at 681. "[U]nexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 211. "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id.* at 204. It also has the "potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record*." Id.*

The PLRA requires "proper exhaustion" of available administrative remedies prior to filing suit. *Woodford v. Ngo*, 548 U.S. 81, 93–94 (2006). As the Supreme Court noted, "[a]ggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons," whether it be concerns about efficiency or "bad faith." *Id.* at 89–90. This is especially true in a prison context. *Id*. at 90 n.1. Nevertheless, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.

"The court may take judicial notice of the SCDC grievance process, specifically, SCDC Policy GA-01.12." *Malik v. Ward*, 8:08-cv-1886-RBH, 2010 WL 936777, at *2 n.4 (D.S.C. Mar. 16, 2010). The policy is summarized as follows:

> After an unsuccessful attempt at informal resolution of the problem(s) by submission of a Request to Staff Member Form or by discussion of the complaint with the appropriate supervisor/staff, (1) an inmate must fill out a Form 10–5, Step 1, and give the form to an employee designated by the Warden (not the Inmate Grievance Coordinator) within fifteen days of the alleged incident; (2) the grievance must then be numbered and entered into SCDC's automated system within ten working days, and the Institutional Inmate Grievance Coordinator (IGC) notified; (3) the IGC must then, within ten working days, finalize the grievance in the system and attempt to informally resolve the issue; if the problem cannot be resolved informally, the IGC will conduct a complete

> investigation and make recommendations for disposition of the matter to the Warden; (4) the Warden must respond to the inmate, in writing, within forty days from the date the grievance was formally entered into the system by the IGC, then the IGC has five working days to serve the Step 1 response to the inmate; (5) the inmate may then appeal the Warden's response to the Division Director of Operations by completing a Form 10–5a, Step 2, and submitting it to the IGC within five "calendar days" of the inmate's receipt of the response; (6) the IGC then notifies the Inmate Grievance Branch of the Step 2 appeal within another five "calendar days" and the Branch must present the Step 2 appeal to the responsible SCDC official, i.e. the Division Director of Operations, for a response; (7) the Division Director of Operations then has sixty days from the date the appeal was received by the IGC at the institution to respond to the Step 2 grievance, and finally, (8) the IGC has five days to serve the inmate with the Step 2 response.

*McFadden v. Reynolds*, C.A. No. 3:13-439-JMC-JRM, 2013 WL 1838656, at *3 n.2 (D.S.C. April 11, 2013) (citing SCDC, Inmate Grievance System, GA–01.12, § 13.4 (Oct. 1, 2010)), *adopted by* 2013 WL 1838644 (D.S.C. May 1, 2013).

As set forth above, the plaintiff's step one grievance regarding the January 9, 2013, incident was received by the IGC on February 15, 2013. The grievance was denied on August 29, 2013, and the plaintiff's step two grievance was received by the IGC on September 4, 2013. The plaintiff filed his complaint in this court on March 10, 2014, and, at that time, he had not yet received a response to his step two grievance.

The court may take judicial notice of the SCDC grievance process set forth above, which provides that once an inmate files a step 2 grievance, the SCDC has sixty-five days from the date the grievance is received to provide the inmate with a response. Here, the plaintiff filed his complaint some 187 days after the IGC received his step two grievance. "When a prisoner files a grievance and has not received a timely determination, the grievance maybe considered exhausted under the PLRA." *Williams v. Reynolds*, No. 4:12-cv-138-RMG, 2013 WL 4522574, at *4 (D.S.C. Aug. 27, 2013) (citing *Boyd v. Con. Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004) (concluding "administrative remedies are exhausted when prison officials fail to timely respond to a

properly filed grievance"); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (holding "we agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable."); *Lewis v. Washington*, 300 F.3d 829, 333 (7th Cir. 2002) (agreeing that administrative remedies are deemed exhausted under the PLRA when prison officials fail to respond to inmate grievances); *Foulk v. Charrier*, 262 F.3d 637, 698 (8th Cir. 2001) (holding "once [the prison] failed to respond to [the prisoner's written grievance], no further administrative proceedings were 'available' to him."); *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired.")). Thus, the plaintiff has exhausted his administrative remedies, and dismissal on this basis should be denied.

***Excessive Force***

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The objective component focuses not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). The objective component can be met by "the pain itself," even if the prisoner has no "enduring injury." *Williams*, 77 F.3d at 762 (internal quotation marks omitted). Regarding the subjective component, the key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (internal quotation marks omitted); *see Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008).

The Fourth Circuit Court of Appeals applies the following factors when analyzing whether a prison official used force in good faith and not maliciously or sadistically: (1) the need for application of force; (2) the relationship between that need

and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321. In *Wilkins v. Gaddy*, the United States Supreme Court held that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. 559 U.S. 34, 36-40 (2010) (citing *Hudson*, 503 U.S. 1, 4 (1992)). However, the Court noted that the absence of serious injury may be one factor to consider in the Eighth Amendment inquiry as it may suggest "'whether the use of force could plausibly have been thought necessary in a particular situation'" and may indicate the amount of force applied. *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7).

Regarding the deployment of chemical munitions in correctional facilities, generally, "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir.1984). Accordingly, courts closely scrutinize its use, evaluating the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas was used [to] determin[e] the validity of the use ... in the prison environment." *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir.1984).

Importantly, no evidence, other than the plaintiff's self-serving allegations, supports a claim of excessive force. *Brown v. Powell*, No. 4:12-cv-3057-DCN, 2014 WL 691662, at *4 (D.S.C. Feb. 21, 2014) (citing *King v. Flinn & Dreffein Eng'g Co.*, 2012 WL 3133677, at *10 (W.D.Va. July 30, 2012) (finding no genuine issue of material fact where only evidence was "uncorroborated and self-serving" testimony)*; Riley v. Honeywell Tech. Solutions, Inc.*, 323 F. App'x 276, 278 (4th Cir. 2009) (holding that plaintiff's "self-serving contentions" that he was treated unfairly "were properly discounted by the district court as having no viable evidentiary support"); *Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir.2000) (holding that a self-serving affidavit was insufficient to survive summary judgment)).

8

While the facts cited above (considered in the light most favorable for the plaintiff) show that force was used against the plaintiff, they are not sufficient to give rise to a genuine issue of fact as to whether constitutionally excessive force was used. The evidence shows that the plaintiff willingly created a disturbance and security risk by refusing to move his arm from the food service flap. He was warned to remove his arm so the flap could be secured, and he refused to comply when requested by officers several times (doc. 16-5, Buterbaugh aff.). The defendant responded by using chemical munitions to gain compliance and restore order. The officers could have entered the plaintiff's cell and used hands-on force to subdue the plaintiff. However, this method would have increased the chance of injury to both the plaintiff and the officers. Also, there is no evidence the force was continued once the plaintiff complied. As recently stated by the district court in a similar case:

> It is unfortunately a fact of life that prisons are dangerous places housing dangerous people under oftentimes tense and strained conditions and circumstances. Having a prisoner engage a correctional officer in a verbal confrontation, engage in unauthorized conduct such as dangling arms out of cell door flaps, . . . , is sufficient to give rise to a reasonable perception on the part of the prison official of a potential threat, and the fact that some amount of force was used by [the defendant] . . . to take control of the situation does not by itself rise to the level of a constitutional violation. The evidence reflects that a minimal amount of force was used, and ceased once the situation was deemed to be under control.

*Briggs v. South Carolina Dept. of Corrections*, No. 9:13-cv-1348-RMG, 2014 WL 1278173, at *19 (D.S.C. Mar. 27, 2014). Furthermore, the medical records show that the plaintiff was seen by a nurse immediately following the incident, and no injuries were noted, he was not in distress, and his breathing was even and non-labored. While the plaintiff complained that his ear was irritated on the second and third day following the incident at issue here, this appears to have been a minor issue as rinsing the ear with water helped and he had no further complaints in this regard (doc. 16-7 medical records). Based upon the foregoing, summary judgment should be granted as to the plaintiff's excessive force claim.

*Eleventh Amendment Immunity*

The defendant contends that the plaintiff's claim for money damages against him in his official capacity is barred pursuant to Eleventh Amendment Immunity. This court agrees. The Eleventh Amendment prohibits federal courts from entertaining an action against a state. *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam). Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir.1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office ... [and] is no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Therefore, Eleventh Amendment immunity protects state agencies and state officials sued in their official capacity from liability for monetary damages under 42 U.S.C. § 1983. *Id*. There is no dispute that the defendant was an employee of the SCDC at the time of the incident at issue. As a result, the defendant is entitled to Eleventh Amendment immunity to the extent the plaintiff has alleged a claim for monetary relief against him in his official capacity.

*Qualified Immunity*

The defendant is also entitled to qualified immunity, which protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, qualified immunity is lost if an official violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the alleged violation such that an objectively reasonable official in the official's position would have known of the right. *Id*. To determine whether qualified immunity applies, a district court must determine a plaintiff has alleged the deprivation of an actual constitutional right at all and whether the particular right was clearly established at the time of the alleged violation. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). "The judges of the district courts and the courts of appeals should be permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, as discussed above, the plaintiff's allegations fail to demonstrate that the defendant violated his constitutional rights. Therefore, the undersigned finds the defendant is entitled to qualified immunity.

*State Law Claims*

Having found that the defendant is entitled to summary judgment regarding the plaintiff's constitutional claim, it is recommended that the court decline to exercise supplemental jurisdiction over any claims for relief construed by the court to be asserted pursuant to state law. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 16) be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 18, 2014
Greenville, South Carolina

11

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 300 East Washington Street
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).